The next case for argument this morning is 13-5076 D'ANDREA BROTHERS v. United States. Mr. Trena, you're doing the main argument and your friend is doing the rebuttal. That is correct, Your Honor. I was standing about eight or nine minutes from myself and Mr. Bialky, who is with my firm, would like to do the rebuttal. Thank you. May it please the Court, my name is Paul Trena and I represent the D'ANDREA BROTHERS. The reason that we're here today is actually because plaintiffs received a verdict in the case on liability and was the prevailing party. And the judge and the Court of Federal Claims then moved to the next issue, which brings us here, and that's the issue of damages, reliance damages. There's a very specific protocol that has been set up by the law regarding how a court analyzes reliance damages and what it goes through. It's a two-step test. The first step is this. The plaintiff is required to prove what the reliance damages were as so-called out-of-pocket damages. Those are somewhat easy. Those are the expenses that are related to the contract and the court makes a determination to see if those were foreseeable. That's the first step. And in deciding that first step, there can be a lesser burden, a lesser degree of scrutiny regarding the certainty of those damages. In other words, when the court has made a determination that there's a breach, the court then looks at the plaintiff and says, what are your damages? And because there's a breach, a willful breach, we're going to take all the circumstances of the breach into consideration because we don't want the wrongdoer to have the benefit. You get the benefit, plaintiff, and that is the first step. But part of your case, just to sort of move things along, part of your case, I think, my understanding is, relies on the fact that you claim that in the but-for world, this is a crater, is that how you pronounce it? It's a contract crater. Crater. Would have been renewed. Would have been, excuse me. Would have been renewed. Isn't that part of your claim? It's a very small part of our claim, Your Honor, and the reason is that that's part of our claim with regard to what a but-for world would look like. Right. In other words, the second half of the damages analysis, which shifts the burden over to the government, is to say the $1.9 million or so that the court found was reasonable and necessary and foreseeable, the defendants now have to show in a but-for, no-breach world, whatever that world would look like, that somehow you couldn't have done better. I think that's the best way to say it. And what I mean to do better doesn't mean we wouldn't have a losing contract at the end. It doesn't mean we have to recoup the $1.9 million in order to get reliance damages. Maybe at the end of the contract we still have a losing contract. Maybe it's only a five-year contract. Maybe it's not. But here's what the court was required to go through with regard to the five-year issue, and I don't think that is a huge issue, Your Honor, and here's the reason why. The analysis was never done in any event, whether it's five years, whether it's ten years or not. And in a no-breach world… Well, I guess I'm a little unclear. Isn't that relevant to the number you were seeking in damages, to the amount you were seeking in damages, the question of whether or not the contract would have been renewed or not? No. No? No. It's relevant to the issue of what we suffered as far as damages at the time of the breach. Those are out-of-pocket damages. Right. Our burden isn't then to show what we would have gotten five years later, ten years later. That burden falls squarely on the government as a matter of law. And what the government has to do there is this. Two things. I want to assume that there's no breach. They have to do that. And we as plaintiff's lawyers always have to do that, and it's the hardest world to create because we don't know what it looks like. It's full of uncertainty. Could it have been five years? It may have been five years. What if the parties were communicating and getting along? Isn't that the but-for world? If there's no breach, there's no breach at all, how do we know that that contract would have ended in five years? I don't know it would have ended in five years. From the plaintiff's perspective, whether it would have ended in five years or not, we don't know. But I'll tell you what we do know. We know that the analysis, the second half of the analysis, it's not our burden to say it would have ended in five years. It's not our burden to say it would have taken 15 years. In fact, if we were to do the analysis, which we have to do usually as plaintiff's lawyers to show lost profits, we would have shown or attempted to show, well, we think the contract would have went on for 10 or 15 years. Then we would have been required to show an economic analysis, revenues and expenses of what our lost profits would be. And then what would have happened in those circumstances? I've been there before. And what happens is the judge says, I don't know what your but-for world and the assumptions you're making. How do we know what would have happened, Mr. Trena? And then I get up there and say, well, I thought it maybe would have gone on past five years. Well, how do you know that? Well, if the parties were communicating, it could have. And so I try to get past that point. And then the court asks the second question. I'm sorry, you don't have a lot of time. Can you get to where the court below made legal error? Yeah, that's the question. We're really not here to redo the case. We're really here to correct something that the trial court clearly did wrong. Can you help us with that? I can. The court made a legal error, a reversible error, on the second half of the damages analysis by applying and looking at and taking into consideration all of the benefits of the breach. That's a standard to be applied under 349 and 352 on behalf of the plaintiff. The court doesn't look at, in the second half of the analysis, which is a but-for analysis, all the circumstances of the breach to help the defendant. That is a standard to be applied and is reversible as a matter of law. What the court looks at in the second half of the but-for analysis is simply an economic analysis, which was never provided by the defendants. That's the first error. The second error kind of runs into it, and the question is, what is the economic analysis that needed to be provided by the defendants to justify the court's conclusion that the DeAndre brothers are not entitled to their $1.9 million in reliance damages? What is the standard and what is the court? What is required of the court? What do they look at? It's clear the burden is on them to show why your losses were not attributable to the contract breach, right? That's correct. And in doing so, Your Honor, what happened? It was not provided. And then the court found that the government established with reasonable certainty, I believe is the magic language, that the DeAndre brothers would have suffered the losses anyway. That's true. Right? That's correct. And you're saying that that was wrong because the court below needed to perform some kind of economic analysis that it did not do? 100% right, Your Honor. I couldn't have said it better. The court can conclude whatever it wants, and that's exactly what the lower court did. What was required of the lower court was, in cases that we have cited, to have some economic model that was provided to them of the but-for world. That was never provided, and admittedly not provided by the defendants. They were supposed to show that model in order to show the parties' respective positions and what it would be in the absence of a breach. What was required by the defendants and never shown to the court to back up its conclusion, to justify its conclusion with reasonable certainty. So exactly what would that model have looked like in your estimation? As I understand it, there was evidence that sales were going down. There was evidence that there was a realization in the middle of the creda that a lot more money and time was needed to build up the brand. There was also evidence that there was a realization that there wasn't that much appreciation for the hooah mark out in the private sector. And so there were multiple different findings that the court made that led up to the ultimate finding of a reasonable certainty that ultimately the client would have lost that money by the end of the five-year contract anyway. So what more, what specifically more did they need to do that they failed to do? What they wanted them to do. Quantitative analysis, which would be required by the plaintiffs. Okay, so what does that mean, quantitative analysis? That means numbers. It means projections of revenues, which we believe revenues or expenses that you would have in 2007, 2008, and 2009. In other words, Your Honor. The line was going down though, right, in terms of sales? Initially there was a bump up of sales that was going up, and then the curve was going down. Right. And then the breach. And then there was only two years left. Right, and we only had two years prior to coming, two and a half years at that point when the breach occurred. So what would have happened in the next two years is the question. From an economic standpoint, Your Honor, that's the issue. And that's what we claim was error because there was no economic basis for what the court came and said. What if we would have made at the end of the contract, our out-of-pocket damage is 1.9. What if at the end we would have losing contract damages, $1.6 million? My clients would be able to recoup those damages. They only made $200,000, but we still suffered a lot. What our complaint is, and the reason we're here today, Your Honor, is that I think the defendants should be held to the same standard that the plaintiffs would be held to in a loss-profit case. I can't just go in there and say I had a contract that was successful for the first two years. I have no economic analysis, Your Honor, but because it was successful for the first two years, it's going to be successful for the next couple of years, and therefore I'm entitled to $10 million more. The court would never buy that without an economic analysis with real numbers. Did your client inform the military that it was filing a trademark application? At which point is how? You mean for the URA trademark? Yeah, when it filed the trademark application. Did the military know about that? Yeah, 100 percent they knew about it. The testimony on the record, and I can find it for you, is that Christian DeAndre, my client, had contacted Gerald Darst and said, hey, we're going to go after the URA trademark. And the testimony is that Mr. Darst said, go for it. Go for it. Now certainly that is an issue. Go for it? Go for it means go for it. Extract royalties out of it? Go for it? Kind of go for it? No, go for it. You can go after it because the military was not interested in it. That was what my client was told, and that was the evidence at trial. There was a lot of issues coming back that had to do with the breach and the allegations back and forth against one another. But certainly if my client had known that the military wanted to do it or Mr. Darst hadn't told them that, maybe they would have worked together on it. I don't know, but that's not what really came out at trial. My clients had every intent, when you read, of working with the government and trying to make money. That's what happened. Well, you mentioned numbers. Clearly there's no hard numbers for the future, and that's what this is speculating about is the future. But they had some numbers. They had the number of years in the contract, which their analysis, and the court bought it, was that it wasn't long enough for you to establish your products in the marketplace and make it profitable. They had the pre-breach sales and the slump in income. They had the brand recognition problems and the name change, which are not as such numbers. Tell me what more you want them to have. I want them exactly to have and produce what I am required to do at trial when I have a lost profits analysis. You have an economic model, and an economic model is required of numbers. Everything, Your Honor, that you have referred to… Who would do such an economic…they would have to hire an economist to do an economic model? And actually they did, Your Honor, after the fact. The problem was you could only be a rebuttal witness. What they had was an accounting expert, a CPA, who couldn't do that analysis, wasn't qualified to do it. The economist is qualified to do it, is required to do it, is required to put record evidence in, is required to do the comparison. In this case, it isn't there, and the case law requires it to be there. Now, at that point in time, the court can say, it seems kind of speculative to me, or it doesn't. But at least something has to be there. It's not, I think, that this would have happened because sales were going down. Thank you, Your Honor. Thank you. You've significantly cut into your rebuttal time. That's okay. We'll restore three minutes. Thank you very much. And let's hear from Ms. Snyder. I mean, sorry, Ms. Floyd. Okay. Your Honor, may it please the Court. The government did have the burden of proving with reasonable certainty the expenditures that would have been lost absent the breach. And the government did make its appropriate showing with a reasonable degree of certainty. In this case, there was more than just anecdotal evidence. In fact, the government's expert, the accountant, Mr. Lesch, presented the Court with a number of charts that were introduced during the trial. And those appear in the appendix to the party brief. In particular, on page A-1507, there's a chart that has a bar graph chart, and I can show it to you just so you may refer to it. But in this particular chart, there was a comparison of revenue versus expenses with an indication as to when the breach occurred. The breach occurred in January 2007 when the government ceased communicating with the Andrea Brothers for a period of seven months. As you see from the chart, the blue revenues in all cases for the first half or first three-fifths of the contract, the revenues were substantially less than the expenses. In fact, almost double in the case of 2005. And further on down, you see even in later 2007-2008, the expenses exceeded the revenues. If the Court would then go look at page A-1508, which is the next page, you can see that these are, according to Mr. Lesch's testimony, the top ten sellers of the HUA Bar. You can see in the period prior to January 2007 that there were large purchases of the HUA Bar by the outside vendors of the product, the commercial vendors, CVS, Amazon. These initial large bumps were the initial purchases, and then the subsequent purchasers occurred later on. But as you see, the majority of the purchases occurred prior to the breach by these outside vendors. What your opposing counsel is saying is that, yes, this is a reflection of what actually happened during those years, but what your side needs to do is provide some projection of what would have happened if the government had not breached the contract. And then is it fair to assume that these graphs would look identical to the way these graphs look without the breach? Well, the Court also must be mindful of what the breach was in this case. There were two breaches that occurred here. One was a failure to communicate for a seven-month period of time. And the other breach was the decision to change the name from HUA to First Strike in the military ration. The Court found that the decision process occurred in 2007. However, the First Strike Bar did not appear in the military ration until late 2008. And the CRADA expired in January 2009. So the Court made a logical conclusion based upon the testimony of Mr. Lesh that it had no impact, the second breach had no impact upon the sales, the commercial sales, because there was no way in which not only the military didn't know that the name had changed, but in fact the commercial people didn't know either. So despite the fact that there was a change in name on the part of the military bar, that did not have any impact in the commercial arena. Military personnel leaving Iraq and Afghanistan wouldn't have gone out to look at a CVS for a First Strike Bar because they hadn't even had a First Strike Bar until very late in 2008. So the Court made a logical conclusion that there was no impact on the breach, there was no impact on the damages. So in terms of projection, I think that is obviated by the fact that there's a logical reason why it had no impact, because the change in name really didn't affect the commercial market. Where is Natick? Was that in Afghanistan? No, Natick is in Natick, Massachusetts, and that's the location where the Army does research in food and military apparel to feed and to protect the soldiers in combat. And so the research was done there, and then the actual procurement takes place in Philadelphia, the procurement for these items for the military. Ms. Floyd, this case really ought to be in domestic relations court. It was a very strident relationship between the parties. It sounds to me like it started out as a marriage of convenience. It was a happy marriage at the beginning. A big love affair, and then for a variety of reasons it didn't work out. You all didn't cook his lunch the way he wanted it cooked, and you didn't think he was coming home at night, and on and on and on. And finally, now you're all fighting over the silverware. The government wasn't interested in settling this, I take it. Your Honor, we couldn't settle. The reason we couldn't settle is because there was no impact upon the plaintiff in terms of failure to communicate. The problem occurred in January 2007. The decision by the Army not to renew the CRADA occurred in December 2006. So it was a five-year CRADA, and the Army didn't have any, although the CRADA provided, the Army had the right to not renew the CRADA. It had an option. It was an option contract, and plaintiffs... had a duty bound to fulfill its terms of the contract for the life of the contract, so why did the government breach that? The government breached it because of the decision on the part of DeAndrea Brothers to change, to acquire the URA trademark. The military bar had Kua URA on it at the time that DeAndrea Brothers acquired the trademark, and because they acquired the trademark, the government could no longer use URA on its bar. So it had to completely change out all of its bars and only have Kua on the bar, and this was a substantial effort on the part of the military, and it also made the Marine Corps unhappy because while Kua is an exclamation for the Army, URA is an exclamation for the Marines, and because in fighting... We don't want the Marines to be unhappy. No, we did not want the Marines to be unhappy, and this is a fact of life. People in the military know about these facts of life, and these are serious concerns on the part of the military. If war fighters are not going to be taking their rations because the Marine Corps exclamation doesn't appear on the bar, then that is a serious issue. So they did have to take that into consideration. So it did have ramifications, and the government wasn't interested in paying an extra 15 cents per bar in order to use the URA term on the bar, and that's what happened. So the government decided not to extend the CRADA, and it made its decision prior to the time that the breach occurred. So that is not part of a breach. Did the government fight the trademark registration? The government had spent a long time thinking about whether it could because for one thing URA is spelled differently in the trademark and the way in which the Marine Corps spells it, but rather than do that, it made the decision to change the name to First Strike. At the same time, the military was bringing out a First Strike ration, a three-part ration, so it fit within what the native was doing on behalf of the war fighter anyway, but nevertheless that's how the issue was resolved. So it was an unhappy experience.  It demonstrated with reasonable certainty that the breach did not cause the damages that DeAndre Brothers is claiming in this case, and for this reason we respectfully request that this court affirm the decision below. Thank you. May it please the court, my name is Jared Bioki, and I represent the DeAndre Brothers LLC. The charts that you looked at up until January 2007, they don't show the but-for world after 2007. We have two years remaining on the contract, 08 and 09. The but-for world does not look at the breach. When did the contract, when was it scheduled to terminate? It was January 09. So you don't really have 09, you just have 08. The charts you look at, my expert did, yes, it's a five-year contract. The charts you looked at, my expert did the same thing. That's how he came up with the $1.9 million in losses. That's why we both agree upon that. There is no but-for world that was done by the government. It was never done. So we look at the things that the tribe, You did your own. We didn't have to do a but-for world, that was their burden. We did not do a but-for world. I thought I heard you say you had your own expert. We did our charts to meet the first prong of the reliance damages, which is to show what our losses are, which is the actual world. That's where the confusion lies between the but-for world and the actual world. Help me out if I've characterized the breach correctly. One is changing the name of the bar at the first strike, right? And then the second one is the government stopped talking to you. They stopped communicating to us for a period of eight to nine months. Right. And just what would be your theory that the kind of running away and hiding for eight or nine months, how did that really impact sales out in the private sector? What would that theory be? Well, if I was doing an expectation damages analysis, which I'm not, my theory would have been that the ace up our sleeve was the government. That's who we went out to, Walmart, CVS, Amazon, and said, we've got a partner here, the government. The government we're working with to put hula bars in the military and to give to the civilian world. But we can't say that when we're not communicating with them for eight months. We can't get any feedback from them. We're not talking to them. That didn't happen. So we're in a world of confusion and chaos where we have 1.9 million invested into something that our partner's gone. The trial court agreed with you on that. Yes. And just let me tie that into how the trial court committed error, which is de novo review. They cited 352 of the restatement, and they said, when the government meets their burden for the but-for world, we've got to look at all the circumstances of the breach. That is 100% incorrect. In the but-for world, you're not looking at the breach at all. You're looking at a world without breach. You don't look at the contract being limited to five years. You have to consider it going on 10, 15, 20. It was automatically renewing after five years. And secondly, you don't look at the changing of the name to First Strike. That's the breach. The but-for world, you don't have breach. It's a world without breach. And so she said the court reached a logical conclusion. That doesn't sound like reasonable certainty to me. That sounds like complete speculation, because what the court's supposed to do is say, well, here's what the numbers would have been in the but-for world. Instead of 1.9 million in losses, you would have only had 1.7. You would have only had a dollar. You would have had a million dollars. I mean, another extra million, 2.9 million. We don't know. What they did is they said, you know what? It would have been the same. So if this ruling is upheld, any defendant who comes forth in a breach of contract case where the plaintiff has found that the defendant breached and they're seeking their reliance damages in Part 1 and the court said they're reasonable and foreseeable, when it comes to the government's burden, all they've got to do is say, would have been the same. Just would have been the same. We don't have to put up the but-for world. So with that, I'm requesting that the trial court's decision with regards to the second prong of the reliance damages test be reversed and the judgment is entered in favor of my client for $1.9 million, $46,039 with interest starting from the time of the breach. Thank you. We thank both parties for cases submitted. That concludes our proceedings for today.